```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF RHODE ISLAND
```

_____
                                   )
BRUCE THUNBERG,                    )
                                   )
        Appellant,                 )
                                   )
    v.                             )    CA. No. 09-419 S
                                   )
MARC D. WALLICK,                   )
                                   )
        Appellee.                  )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Appellant Bruce Thunberg ("Thunberg" or the "Debtor") filed for Chapter 7 protection in August 2000 and was discharged from bankruptcy in December 2001. In this action, Thunberg appeals from a decision by the bankruptcy court revoking his discharge pursuant to 11 U.S.C. § 727(d)(2). The court found Thunberg concealed assets of the bankruptcy estate in an effort to mislead the Trustee, Appellee Marc D. Wallick, and shirk the bankruptcy disclosure rules. Thunberg contends there was insufficient evidence for the bankruptcy court to conclude that he acted "knowingly and fraudulently," as a debtor must, to be penalized under § 727(d)(2). The Court disagrees. Therefore the appeal is denied. The record contains ample evidence of misdirection and deceit by the Debtor, supported by the credibility determinations of the bankruptcy court.

I.  The Bankruptcy Court's Decision

11 U.S.C. § 727(d)(2) authorizes a bankruptcy court to revoke a debtor's discharge from bankruptcy if the trustee proves the following:

> [T]he debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee.

11 U.S.C. § 727(d)(2) (2010).  The bankruptcy court canceled Thunberg's discharge pursuant to § 727(d)(2) because it found he had acquired and hidden two sums of cash:

First, the Debtor received $30,000 in November, 2000 pursuant to a divorce settlement with his ex-wife.  Thunberg had told his lawyer and the Trustee that the settlement proceeds were subject to liens held by two bank lenders.  This would exclude them from the estate.  Thus, the Trustee agreed to let him transfer the payments directly to the banks, pending confirmation that they were secured.  To commemorate that understanding, Thunberg's lawyer wrote a letter to the Trustee in November 2000:

> It is the position of the Debtor that the [divorce] agreement . . . is subject to security interests . . . . In the absence of a Court order to the contrary, the Debtor intends to continue honoring these security agreements and making payments to the secured creditors <u>as the Debtor receives payment from his former spouse</u>.

(Joint Pre-Trial Order, May 2, 2008 (hereinafter "JPTO"), Ex. V (emphasis added).)  It later turned out that the liens were unperfected.  More troubling to the bankruptcy court was that, when Thunberg obtained the cash, he did not give it directly to the banks.  Instead, he deposited the money in a business account under his control, and only later passed some of it on to his creditors.  See Wallick v. Thunberg (In re Thunberg), 413 B.R. 20, 22-23 (Bankr. D.R.I. 2009).

Second, Thunberg received $50,000 in June 2001, pursuant to a compromise with his ex-wife that gave him an advance on future divorce agreement payments.  The bankruptcy court found that Thunberg concealed the settlement from both his attorney and the Trustee.  He did not deliver the money to the estate.  Instead, he deposited it into his personal checking account, paid a portion to his bank creditors, and moved another portion to one of his business accounts.  See id. at 23-24.

When the Trustee petitioned to have Thunberg's discharge revoked, Thunberg argued that the dispute was all a misunderstanding.  He claimed he did not intend to break the bankruptcy rules; as far as he knew, the liens held by his bank creditors were valid.  He also noted that he did later transfer some of the divorce settlement payments from his accounts to the banks.  Plus, he protested, he believed only a portion of those funds was secured, and that he could keep the rest.

3

The bankruptcy court, however, found Thunberg's financial machinations were designed to cheat his creditors. Specifically, the court concluded that Thunberg: "(1) remained silent as his attorney mistakenly and incorrectly represented to the Trustee that funds were being paid to secured creditors; (2) engaged in secret negotiations involving estate property; and (3) then hurriedly disbursed the proceeds of the unauthorized settlement, all without his lawyer's knowledge." Id. at 24-25.

The bankruptcy court explained that the "totality of the Debtor's post-petition conduct" demonstrated that he "acted with . . . intent to defraud." Id. at 26. In particular, the court rejected Thunberg's explanations for his actions as not credible. Indeed, it observed that Thunberg's credibility "became less reliable the longer he remained a witness." Id. at 23 n.3. As the court put it:

> To have any validity, . . . the Debtor's [legal briefs] would require one to presume that all of the Debtor's testimony is true and worthy of belief, whether disputed or uncontradicted. That would call for the kind of leap that this Court is not able or willing to make, and is illustrative of the nature of the problems confronting both of Mr. Thunberg's attorneys in this proceeding, i.e., the reality of what the Debtor was doing, versus the truth or falsity of what allegedly was in his mind. As the trier of the facts, the Court is in nearly total disagreement with the factual and conclusory assertions of Debtor's successor counsel.

Id. at 27.

II. Standard of Review

The Court reviews the judgment of a bankruptcy court for "clear error" unless based on a mistake of law. Gannett v. Carp (In re Carp), 340 F.3d 15, 22 (1st Cir. 2003). "[I]f the bankruptcy court's findings are supportable on any reasonable view of the record, [a reviewing court is] bound to uphold them." Id.

Debtors bear a general obligation to disclose assets of the estate and surrender them to the trustee. See 11 U.S.C. §§ 521(1), 541(a)(7); Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987) ("[T]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure.") (quotation marks, alterations, and citations omitted); Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1286 (11th Cir. 2002) ("The duty to disclose is a continuing one that does not end once the [filing] forms are submitted to the bankruptcy court . . . .").

Section 727 sets penalties for defying the disclosure rules. The most severe is revoking a debtor's discharge from bankruptcy pursuant to § 727(d)(2). To obtain revocation, the trustee must demonstrate by a preponderance of the evidence that "(1) the debtor acquired property of the estate; and (2) the debtor knowingly and fraudulently failed to report or deliver the property to the trustee." Yules v. Gillis (In re Gillis),

5

403 B.R. 137, 145-46 (B.A.P. 1st Cir. 2009). "[R]evoking a discharge is an extraordinary remedy," and § 727(d)(2) should thus "be construed liberally in favor of the debtor and strictly against those objecting to discharge." Id. at 144. Yet, the trustee may prevail by demonstrating "reckless indifference to the truth which has consistently been treated as the functional equivalent of fraud" for purposes of § 727. Tully, 818 F.2d at 112 (internal citation and quotation marks omitted).[1]

III. Discussion

In this case, a "reasonable view of the record" supports the bankruptcy court's conclusion that Thunberg intended to deceive the Trustee and his creditors. Carp, 340 F.3d at 22. He represented to his attorney that the divorce settlement payments were secured. Thus, the Trustee understood Thunberg would abide by the security agreements and "forward the funds directly to the bank[s]." (Revocation Hr'g. Tr. 14:1-2, June 17, 2008 (hereinafter "Tr.").) This did not happen. With

---

[1] When applying § 727(d)(2), bankruptcy courts look to cases, such as Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987), addressing the similar standard for preventing discharge on basis of fraud pursuant to § 727(a)(4). See 11 U.S.C. § 727(a)(4) (authorizing refusal of discharge if the debtor "knowingly and fraudulently" misrepresents assets); Houghton v. Marcella (In re Marcella), BK No. 05-50261-HJB, A.P. No. 07-04158-HJB, 2009 WL 3348251, at *15-18 & n.31 (Bankr. D. Mass. Oct. 15, 2009) (relying extensively on Tully in addressing a request to revoke the debtors' discharge, but ultimately distinguishing it on its facts).

6

respect to the $30,000 received in November 2000, Thunberg admits he "deposited the . . . payment into a business account." (Appellant's Br. 8.) As for the $50,000 received in June 2001, Thunberg states he moved the money "through a series of accounts," and eventually gave approximately $25,000 to one of the banks. (Id. at 9.)

For the sake of argument, the Court can accept that Thunberg may have held a good-faith belief that he was entitled to keep at least part of the divorce settlement proceeds. Apparently, the agreement divided payments into two categories, "alimony" and "property settlement" funds. See Thunberg, 413 B.R. at 22. Thunberg's attorney affirmed that, at some point, he advised Thunberg it was acceptable to keep the alimony portion of the payments. (See Tr. 102:7-15.) However, as the bankruptcy court observed, this still does not clarify "how the Debtor could reasonably have believed that he was authorized to retain the non-alimony portion of the [$30,000] payment." Thunberg, 413 B.R. at 23.

There was no clear error in finding that Thunberg's explanation on that point does not add up. Thunberg claims his creditors set their own repayment schedules, which did not track the annual payments in the divorce agreement. Thus, he asserts he did not see any problem with depositing the $30,000 in his account, and then making payments to the banks "from time to

7

time when they were due." (Tr. 47:13-24.) Nothing corroborates Thunberg's professed belief that this was permissible. There is no evidence that he revealed the separate payment schedule to his attorney or otherwise attempted to disclose it to the Trustee. On the contrary, according to the attorney's November 2000 letter, he believed Thunberg had pledged to "mak[e] payments to the secured creditors as [he] receive[d] payment from his former spouse," not "when [payments] were due." (JPTO Ex. V.) Moreover, Thunberg's lawyer testified that he never told Thunberg he could keep all the money, and that Thunberg never said he planned to retain it:

> Q. You never told Mr. Thunberg that he could keep the $30,000, did you, at that time?
> A. You mean keep as opposed to pay to the bank?
> Q. Yes.
> A. No, I never told him.
> Q. Did he ever tell you that it was his intention to keep the money and not pay it to the bank?
> A. No.

(Tr. 119:9-19.) Thunberg's excuse for his activities sputters to a halt in view of the letter and the quoted testimony.

Thunberg fares no better in defending the $50,000 advance on his divorce agreement income in June 2001. He claims he told his attorney about the negotiations with his ex-wife before the money arrived. (See Tr. 60:6-61:5.) But the bankruptcy court credited conflicting testimony from the debtor's attorney, who proclaimed, "I did not learn about [the $50,000 compromise]

8

until after the fact, and I think it was well after the fact." (Id. 112:23-113:1.) This disparity made it reasonable to conclude that "the Debtor's version of this episode is . . . a fabrication."[2] Thunberg, 413 B.R. at 24.

In sum, the bankruptcy court's decision hinged on discrepancies between what Thunberg did and what his attorney, and the Trustee, thought was happening. The court found Thunberg's lack of credibility in addressing the transactions showed he had tried to dupe his creditors. In this respect, adverse inferences drawn from the "demeanor and credibility" of a debtor can serve as evidence of fraudulent intent for purposes of § 727. See Hamo v. Wilson (In re Hamo), 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999) (affirming a finding of a § 727 violation based in part on the fact that the bankruptcy court observed "the demeanor and credibility of the [d]ebtor . . . and did not credit the testimony that [filing omissions] were innocent oversights"); McClendon v. DeVoll (In re DeVoll), 266 B.R. 81, 99 (Bankr. N.D. Tex. 2001) ("In light of the extensive omissions

---

[2] Thunberg also points to a letter from his attorney to the trustee in August, 2001. The letter, he insists, shows he came clean about what he says is the "property settlement" portion of the June payment, $22,000. (See JPTO Ex. S.) However, the letter came more than a month after the fact. It also does not explain why Thunberg thought he could move the money through his own accounts in the first place, rather than pay it directly to the banks. It thus does not back up his current story about the separate payment schedule set by his creditors.

in [d]ebtor's schedules and statements of financial affairs, and [d]ebtor's repeatedly inconsistent sworn testimony, the Court concludes, at best, that [d]ebtor has been recklessly indifferent to the truth.").

As a result, Thunberg cannot carry his burden on this appeal.  Even if reasonable minds could differ about whether the printed transcript shows that Thunberg lied, the bankruptcy court already found he should not be believed.  This Court is not in a position to disagree.  See Watman v. Groman (In re Watman), 458 F.3d 26, 34 (1st Cir. 2006). ("Where the intent issue turns on the credibility and demeanor of the debtor, we typically defer to the bankruptcy court's conclusions.").  And nothing else in the record shows the bankruptcy court's ruling was so clearly against the weight of the evidence that it was unreasonable.

IV. Conclusion

For the reasons stated above, the bankruptcy court's decision must be affirmed.  The appeal is therefore DENIED.

IT IS SO ORDERED.


/s/ William E. Smith
William E. Smith
United States District Judge
Date:  May 4, 2010

10